### In re Paul L. Handy (Town of Shelburne, Appellant)
### In re Jolley Associates

[764 A.2d 1226]

Nos. 98-015 & 98-016

Present: **Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.**

Opinion Filed November 17, 2000

*Joseph S. McLean* and *Steven F. Stitzel* of *Stitzel, Page & Fletcher, P.C.*, Burlington, for Town of Shelburne.

*Howard J. Seaver* of *Greene & Seaver, Inc.*, Burlington, for Appellant Jolley Associates.

*Douglas K. Riley* of *Lisman & Lisman*, Burlington, for Appellee Handy.

**Dooley, J.** In these consolidated appeals, we consider the status of zoning permit applications filed during what we will refer to as the "pendency period" — the period from the date that public notice is given of proposed amended zoning bylaws and the date that the bylaws come into effect. At issue is the meaning of 24 V.S.A. § 4443(d),[1] which provides that, following public notice of a proposed zoning bylaw amendment, a town administrator may not issue a permit regarding that amendment during the period between notice and the effective date of the adoption or rejection of the amendment, except with the written consent of the town's legislative body after public notice and hearing. In construing § 4443(d), the environmental court bifurcated the pendency period, ruling that (1) persons filing permit applications after public notice but before the town's adoption of amended zoning bylaws may elect to have their applications reviewed under the old bylaws or petition the town's legislative body to consent to review of the applications under the amended bylaws; and (2) applications filed after the town's adoption, but before the effective date of the adoption, of amended bylaws must be considered under the new bylaws. We find no basis in the plain language of the statute to support the court's construction of § 4443(d), but conclude that the statute is unconstitutional because it gives town selectboards unbridled discretion to decide whether to review applications under the old or new zoning bylaws, with no standards to limit the exercise of that discretion. Accordingly, we conclude that the permit applications in both cases must be considered under our vested rights rule. We affirm the court's decision in the Handy case, albeit on different grounds, and vacate the decision in Jolley and remand for further proceedings consistent with this decision.

I.

The relevant procedural and historical facts are, for the most part, undisputed in both appeals. On December 3, 1996, the Town of

---

[1] Formerly 24 V.S.A. § 4443(c), the subsection was redesignated as § 4443(d) effective July 1, 1998, when another subsection was added to § 4443. 1997, No. 125 (Adj. Sess.), § 3.

Shelburne published notice of a December 19 planning commission hearing to consider certain proposed zoning bylaw amendments, including amendments that would eliminate gas stations and fast-food restaurants as conditional uses in the Town's residential-commercial zone.[2] At the December 19 hearing, the planning commission voted to recommend that the Town selectboard adopt the proposed amendments. On January 5, 1997, the selectboard published notice of a January 21 public hearing to consider the proposed amendments. At the January 21 hearing, the selectboard adopted the amended bylaws. The Town's adoption of the bylaws became effective twenty-one days later, on February 11. 24 V.S.A. § 4404(c) (bylaw amendment shall be effective twenty-one days after its adoption).

With respect to the Handy case, in the summer of 1996 Paul Handy filed applications seeking, among other things, a permit to add gasoline pumps to a convenience store on his property in the Town's residential-commercial zone. The Town denied the applications in August 1996 for reasons unrelated to the gasoline pumps, which were permitted as a conditional use under the zoning bylaws in effect at the time. Handy did not appeal the Town's decision, but instead modified his site plan and revised the applications to respond to the concerns that had led to their denial.

On January 13, 1997, after the Town published notice of the proposed amended bylaws, but eight days before they were adopted, Handy submitted his revised applications seeking conditional use and variance approval for his proposed project. On February 10, the day before the new bylaws became effective, the selectboard held a public hearing under § 4443(d) to consider whether to give its written consent for the zoning administrator to act on Handy's revised applications under the old bylaws. Following the hearing, the selectboard issued a written decision denying its consent for Handy to proceed under the old bylaws.

On appeal, the environmental court concluded that (1) this Court's holding in *Smith v. Winhall Planning Commission*, 140 Vt. 178,

---

[2]There appears to be an inconsistency between the undisputed statement of facts contained in the environmental court's decision in the Jolley case — which indicates that the amendments proposed eliminating gas stations and fast-food restaurants as permitted uses in the residential-commercial zone — and the selectboard's decision in the Jolley case — which indicates that the amendments proposed eliminating gas stations as a use in the residential-commercial zone and reclassifying fast-food restaurants as a conditional use in that zone. The parties neither challenge the environmental court's finding nor mention the apparent discrepancy, which is not significant to our resolution of the cases before us.

181-82, 436 A.2d 760, 761-62 (1981), entitles applicants such as Handy to have their good-faith applications considered under the bylaws in effect at the time that they were filed; and (2) when applications are filed prior to the selectboard's approval of proposed amended bylaws, § 4443(d) is triggered only if the applicants elect to request the selectboard to consider their applications under the new bylaws. Because Handy did not request consideration under the new bylaws, and because he filed his applications before the selectboard approved those bylaws, the court ruled that he had a right to have his applications considered under the old bylaws, as long as the applications were complete and filed in good faith. The court remanded the matter to the zoning board of adjustment (ZBA) to consider the applications for conditional-use or variance approval under the old zoning bylaws, and then, if necessary, to the selectboard, apparently to consider whether the applications were complete and filed in good faith. The Town appeals.

With respect to the Jolley case, in April 1996 Jolley Associates (Jolley) contracted to purchase property in the Town's residential-commercial zone, intending to construct a combination gas station, convenience store, and fast-food restaurant. Obtaining the necessary zoning permits was one of the contract contingencies. Under the zoning bylaws in effect at the time, all three of Jolley's intended uses were allowed as conditional uses in the residential-commercial zone. In September 1996, Jolley met with town officials to discuss its proposed project.

On February 6, 1997, sixteen days after the Town adopted the amended bylaws, but five days before those amendments became effective, Jolley submitted conditional-use applications for his project under the old bylaws. Following a public hearing pursuant to § 4443(d), the selectboard denied Jolley's request for consent to proceed with its applications under the old bylaws. On appeal, the environmental court concluded that the right of applicants to have their permit applications considered under the zoning bylaws in effect at the time the applications are filed does not extend to situations in which the applications are filed between the adoption and the effective date of new bylaws. According to the court, applications filed after the adoption of amended bylaws must be considered under the new bylaws. Because Jolley had filed its applications after the Town's adoption of the amended bylaws, the court ruled that they must be considered under the new bylaws. The court remanded the matter to the ZBA to consider the applications for conditional use or variance

approval, and then, if necessary, to the selectboard for consideration under § 4443(d). Jolley appeals, and the Town cross-appeals.[3]

In the Handy case, appellant Town of Shelburne argues that the environmental court erred in ruling that applicants seeking zoning permits after public notice but before adoption of proposed amended bylaws may elect to seek the consent of a town's legislative body under § 4443(d). In the Jolley case, appellant Jolley argues that the plain language of § 4443(d) does not support the environmental court's distinct treatment of applications filed between public notice and adoption of amended bylaws, and those filed between the adoption and effective date of amended bylaws. According to Jolley, either its applications should be considered under the old bylaws based on the environmental court's reasoning in the Handy case, or the environmental court should consider, upon de novo review, whether the circumstances and equities surrounding its applications require review of the applications under the old bylaws. As appellee and cross-appellant in the Jolley case, the Town contends that any review of the selectboard's decision under § 4443(d) should be on the record, giving deference to the selectboard's broad discretion, and further that the record before this Court supports the selectboard's decision. Both Jolley and the Town agree that the environmental court erred in concluding that applicants must submit their conditional-use applications to the ZBA before seeking the selectboard's consent to proceed under the old bylaws pursuant to § 4443(d).

## II.

We first consider the environmental court's construction of § 4443(d). The statute provides as follows:

> If a public notice[4] is issued under this chapter with respect to the adoption or amendment of a bylaw, or an

---

[3] Neither the Town nor Jolley appealed from a final judgment. See *In re Cliffside Leasing Co.*, 167 Vt. 569, 570, 701 A.2d 325, 325 (1997) (mem.). Nevertheless, we exercised our discretion under V.R.A.P. 2 to consider both appeals, stating that the criteria contained in V.R.A.P. 5(b) had been met, and that resolution of the legal issues raised in the appeals did not require further factual development.

[4] Section 4443(d) does not specify whether the "public notice" referred to is the public hearing notice required of the planning commission by 24 V.S.A. § 4403(d) or the public hearing notice required of the selectboard by 24 V.S.A. § 4404(a). Because it is undisputed that both Handy and Jolley submitted their applications after both public hearing notices, we need not decide the issue at this time. See *Preseault v. Wheel*, 132 Vt. 247, 250, 315 A.2d 244, 246 (1974) (discussing but not resolving issue).

amendment to an ordinance adopted under prior enabling laws, the administrative officer shall not issue any permit under section (a)(1) of this section, if the permit is with regard to the bylaw, or amendment to a bylaw or ordinance, for the period commencing upon the date of that public notice and ending upon the effective date of the adoption or rejection of the bylaw or amendment, except with the written consent of the legislative body of the municipality given after public hearing upon public notice.

24 V.S.A. § 4443(d). We find nothing in the plain language of § 4443(d) to support either the environmental court's distinct treatment of permit applications filed before or after the adoption of amended bylaws, or its conclusion that persons filing applications before the adoption of amended bylaws may elect to request a town's legislative body to review applications under the amended bylaws.

In construing a statute to determine the Legislature's intent, our first step is to examine the language of the statute itself. *Town of Hinesburg v. Dunkling*, 167 Vt. 514, 525, 711 A.2d 1163, 1169 (1998). We presume that the Legislature intended the plain, ordinary meaning of the language, and if the meaning of that language is plain on its face, we normally ascertain legislative intent solely from the statutory language. *Id.* "It is inappropriate to read into a statute something which is not there unless it is *necessary* in order to make the statute effective." *State v. O'Neill*, 165 Vt. 270, 275, 682 A.2d 943, 946 (1996); accord *In re Weeks*, 167 Vt. 551, 554, 712 A.2d 907, 909 (1998) (there is no need to look beyond plain language of statute if it resolves legal dispute without doing violence to legislative scheme).

■ Here, the plain meaning of § 4443(d) is that a town administrator may not issue a zoning permit during the period between public notice and the effective date of the adoption or rejection of proposed amended bylaws if the permit is "with regard to" the proposed bylaws, except with the written consent of the town's legislative body following public notice and hearing. We find unavailing Handy's argument that the term "with regard to" refers to permit applications that could be granted only under the amended bylaws. Rather than read an unnecessary limitation into the statutory language, see *In re Graziani*, 156 Vt. 278, 282, 591 A.2d 91, 94 (1991) ("we ordinarily do not assume that words are used in a more limited sense than their plain meaning"), we assume that the undefined term retains its plain and commonly accepted meaning. *Donley v. Donley*, 165 Vt. 619, 620,

686 A.2d 943, 945 (1996) (mem.). The ordinary, commonly accepted meaning of the term "with regard to" is not limited in the way suggested by Handy. Webster's New Int'l Dictionary (2d ed. 1961) (defining "with regard to" as "with respect to; relating to; concerning; as to"); see also *Phoenix Leasing, Inc. v. Sure Broadcasting, Inc.*, 843 F. Supp. 1379, 1388 (D. Nev. 1994) (defining "with respect to" as "with reference to, relating to, or pertaining to"); *Smith v. Matthews*, 611 So. 2d 1377, 1380 (La. 1993) (same).

Moreover, the prohibitory, rather than permissive, language of § 4443(d) belies the environmental court's conclusion that the statute allows persons filing applications before adoption of amended bylaws to elect whether to have a town's legislative body review the applications under the amended bylaws. If the Legislature had intended to allow applicants to elect review under pending amended bylaws, such an election would undoubtedly have been expressed in permissive language. Plainly, the prohibitory language in the statute is aimed at limiting the issuance of permits under bylaws in the process of being amended, rather than allowing a new category of permits in advance of the effective date of proposed bylaws that might authorize them.

Apparently, the environmental court felt compelled, under the reasoning in *Smith v. Winhall Planning Commission*, to bifurcate the pendency period delineated in § 4443(d) and create an election for those applicants filing before adoption (or rejection) of proposed amended bylaws. Although *Smith* may prove central to the resolution of these disputes, as addressed at the end of this opinion, it does not control the construction of the statute. *Smith* establishes our vested rights rule in the absence of a controlling statute. *In re McCormick Management Co.*, 149 Vt. 585, 588, 589-90, 547 A.2d 1319, 1321, 1322-23 (1988) (where "the legislature has dictated how th[e] policy considerations should apply," the *Smith* rule does not control). Here, § 4443(d) is a controlling statute.

We recognize that the environmental court concluded that § 4443(d) overlapped with the vested rights holding of *Smith*, and it could implement both through its construction of § 4443(d). We conclude, however, that its construction of § 4443(d) is at variance with both the letter of the statute and the policy behind it. The obvious intent behind § 4443(d) is to create a "moratorium" on the issuance of permits for proposed projects whose status may be affected by pending amendments to zoning bylaws. Such a moratorium period assures that persons cannot compel towns to grant

permit applications that comply with current zoning bylaws but are repugnant to pending bylaw amendments. Under the environmental court holding, there is no moratorium.

## III.

Our rejection of the environmental court's construction of § 4443(d) does not necessarily mean that we must reverse the court's decisions. We will not reverse a lower court's decision "if the record before us discloses any legal ground which would justify the result," *Sexton v. Greer*, 135 Vt. 343, 345, 376 A.2d 750, 751 (1977), "whether briefed or not." *Butler v. Milton Cooperative Dairy Corp.*, 112 Vt. 517, 518, 28 A.2d 395, 396 (1942). We have applied this principle on numerous occasions over the years, and yet have never suggested, as the dissent does here, 171 Vt. at 359, 764 A.2d at 1245, that an alternative affirmance rationale can be used only in the case of glaring error or exceptional circumstances when constitutional principles are involved. There is no heightened standard by which we apply unraised legal theories to affirm lower court decisions made on other grounds, regardless of whether those theories are constitutionally based.

Nor is there anything in our precedents to suggest that an alternative ground for affirmance cannot be our determination that a statute is unconstitutional in the context of the case before us. The dissent suggests that V.R.A.P. 44 bars such consideration because no party has notified the clerk of this Court to give the Attorney General an opportunity to intervene and defend the constitutionality of the statute. Like the federal model on which V.R.A.P. 44 is based, see 28 U.S.C. § 2403; Fed. R. App. P. 44, our self-imposed rule is not jurisdictional so as to prevent the adjudication of a constitutional issue in the absence of official notice. *Tonya K. v. Board of Educ. of Chicago*, 847 F.2d 1243, 1247 (7th Cir. 1988). Unlike the federal model, which requires notification whenever the constitutionality of a statute is "drawn in question," 28 U.S.C. § 2403, our rule applies only when a *party* raises the constitutional challenge. V.R.A.P. 44.

In any event, we have carefully considered whether notification would perform a useful purpose or change the outcome, and have decided that it would do neither. Whenever we adopt a rationale for our decision different from that employed by the trial court and directly addressed by the parties, we take on the responsibility to fully research and explore our alternative. We have done so in this case.

As the above discussion suggests, we conclude there is an alternative ground on which to affirm the Handy case. This alternative ground was foreshadowed by Jolley's argument that § 4443(d) may not be construed to give town selectboards unfettered discretion to grant or deny review of permit applications under current rather than proposed zoning bylaws. We would agree with that argument if we could find any way in the statutory language to limit that discretion. We conclude, however, that the statute can be construed only to give selectboards unfettered discretion to grant or deny permission to apply existing bylaw provisions, without regard to any proposed amendments. Thus, we do not agree with the dissent that *we* can create the necessary standards that would contain discretion, and especially we do not agree that we can create them after the fact. For this reason, as more fully set out *infra*, we conclude that § 4443(d) is unconstitutional because it is not limited by standards or guidelines.

As explained more fully in the discussion to follow, our alternative decision will reach exactly the outcome the environmental court reached in Handy — that is, that § 4443(d) is not implicated in the decision on Handy's permit application. Our duty to affirm lower court decisions on any legal theory would not require us to reach the constitutional point in the Jolley case, but we do so as a matter of fairness, given that we are reaching the issue in its companion case.

 We now turn to the merits of the constitutionality of § 4443(d). In *Town of Westford v. Kilburn*, 131 Vt. 120, 124, 300 A.2d 523, 526 (1973), we announced the requirement of deliberative standards for acting on zoning applications. At the time, the Westford zoning ordinance denied permission for any business, commercial, industrial or agricultural uses unless all adjoining landowners and long-term lessees consented to the use. As a safety valve, however, it authorized the zoning board to allow special exceptions after considering promotion of the public health, safety, convenience, and welfare of the inhabitants, encouraging the most appropriate use of land and protecting and preserving property value. Appellants, who wanted to use their barn for barn dances, attacked the ordinance as providing an insufficient standard for the exercise of the board's discretion and for delegating power, without standards, to neighbors.

This Court upheld the challenge to the ordinance, concluding that the special exception provision failed "to prescribe appropriate conditions and safeguards" and delegated authority to adjacent property owners "with . . . no standards to govern its use." *Id.* at 125-26, 300 A.2d at 527. We described the reasons for requiring standards:

When the Board of Adjustment exercises this discretion, guiding standards assure all parties concerned it has been exercised in a proper manner. When no such guiding standards are spelled out by the legislative body, the door is opened to the exercise of this discretion in an arbitrary or discriminatory fashion. As a consequence of a failure of a legislative body to spell out guiding standards, the applicant for a permit is left uncertain as to what factors are to be considered by the Board of Adjustment.

. . . On one hand the standards governing the delegation of such authority should be general enough to avoid inflexible results, yet on the other hand they should not leave the door open to unbridled discrimination.

*Id.* at 124-25, 300 A.2d at 526.

Although *Kilburn* is grounded in the then-existing enabling statute, rather than the constitution, it relied largely on two constitutional decisions. *Waterville Hotel Corp. v. Board of Zoning Appeals*, 241 A.2d 50 (Me. 1968), the chief case relied upon in *Kilburn*, held that where a zoning ordinance attempts to authorize municipal officials to act on permit requests "without the guidance of any standards, equal protection is denied the citizens." *Id.* at 52; accord *State ex rel. Humble Oil & Refining Co. v. Wahner*, 130 N.W.2d 304, 309 (Wis. 1964) (ordinance that gives power to board to deny permit for gas station without adequate standards is unconstitutional). Thus, it expresses both the statutory and constitutional rule. See *Powers v. Common Council of Danbury*, 222 A.2d 337, 338 (Conn. 1966) (although requirement of standards is statutory, "it should also be noted that such a requirement is a fundamental aspect of constitutional law"). Recently, in *In re Miserocchi*, 170 Vt. 320, 749 A.2d 607 (2000), we relied upon *Kilburn* in holding that "a decision arrived at without reference to any standards or principles is arbitrary and capricious; such ad hoc decision-making denies the applicant due process of law." *Id.* at 325, 749 A.2d at 611 (citation omitted).

There are actually three overlapping theories under which a delegation of standardless zoning approval power is found unconstitutional: (1) a delegation of legislative power without adequate standards violates the separation of powers required by the state constitution; (2) the power to grant or refuse zoning permits without standards denies applicants equal protection of the laws; and (3) administration of zoning without standards denies landowners due

process of law because it does not give them notice of what land uses are acceptable. O. Delogu & S. Spokes, *The Long-Standing Requirement that Delegations of Land Use Control Power Contain "Meaningful" Standards to Restrain and Guide Decision-Makers Should Not Be Weakened*, 48 Me. L. Rev. 49, 54-57 (1996).

The first rationale dominates and is accepted in virtually every state jurisdiction. See 3 K. Young, Anderson's American Law of Zoning § 21.09 (4th ed. 1996); see also *Vincent v. Vermont State Retirement Bd.*, 148 Vt. 531, 535, 536 A.2d 925, 928 (1987) (explaining application of delegation doctrine in Vermont).[5] As explained by the Maryland Court of Appeals:

> When legislative power is delegated to administrative officials it is constitutionally required that adequate guides and standards be established by the delegating legislative body so that the administrative officials, appointed by the executive and not elected by the people, will not legislate, but will find and apply facts in a particular case in accordance with the policy established by the legislative body.

*Gino's of Maryland, Inc. v. City of Baltimore*, 244 A.2d 218, 229 (Md. 1968) (emphasis omitted). It makes no difference that the delegation in this case is to a body that also exercises legislative power. Young, *supra*, § 21.10, at 721-22. Even if separation of powers could be applied to town governance, the selectboard here was exercising administrative power by establishing the proper zoning regime for a particular use on a particular piece of property. See *Powers*, 222 A.2d at 338.

The latter two rationales are most important in administrative adjudication. See S. Koslow, *Standardless Administrative Adjudication*, 22 Admin. L. Rev. 407, 422-28 (1970). The main concern of the second rationale is consistent decisions. *Waterville Hotel*, the Maine

---

[5] The delegation doctrine has had a more checkered history at the federal level. At one point, Professor Davis described the doctrine as "almost a complete failure." K. Davis, *A New Approach to Delegation*, 36 U. Chi. L. Rev. 713, 713 (1969). It has, however, been featured in some more recent opinions of the Supreme Court, and some scholars have called for greater reliance upon it. See, e.g., R. Pierce, *The Role of Constitutional and Political Theory in Administrative Law*, 64 Tex. L. Rev. 469, 470-72 (1985). Despite the controversy over the doctrine, a central focus of federal administrative law has been on managing and controlling agency discretion. See generally R. Stewart, *The Reformation of American Administrative Law*, 88 Harv. L. Rev. 1669 (1975). Moreover, the delegation doctrine has remained alive at the state level despite the federal controversy. See G. Greco, *Standards or Safeguards: A Survey of the Delegation Doctrine in the States*, 8 Admin. L.J. Am. U. 567, 580-603 (1994).

case we relied upon in *Kilburn*, relied in turn on *Osius v. City of St. Clair Shores*, 75 N.W.2d 25 (Mich. 1956), which held:

> Without definite standards an ordinance becomes an open door to favoritism and discrimination, a ready tool for the suppression of competition through the grant of authority to one and the withholding from another. . . . A zoning ordinance cannot permit administrative officers or boards to pick and chose the recipients of their favors.

*Id.* at 28. As we said in *Kilburn*, the absence of standards results in the exercise of discretion in a discriminatory fashion. *Kilburn*, 131 Vt. at 124, 300 A.2d at 526.

While excessive discretion might lead to favoritism and discrimination, it is not true, as the dissent suggests, 171 Vt. at 357, 764 A.2d at 1243, that a vague standard examining whether favoritism or discrimination exists will be effective in controlling discretion. It is unlikely, given the limited record available by hindsight review under § 4443(d), that a court would be able to determine whether favoritism or discrimination had been involved in a specific selectboard's decision, particularly given the infrequent use of the statute in Vermont towns. Judicial review would be illusory under the dissent's proposed standards. In fact, consistency would be illusory without statewide standards in this context. Given the infrequent review under § 4443(d), no "common law" of selectboard review could develop. It is unlikely that any town would be able to adopt consistent standards, in accordance with the dissent's suggestion.

This Court has already accepted the third rationale, which is concerned with assuring that the landowner be given fair notice of what it can and cannot do with the land. *Miserocchi*, 170 Vt. at 325, 749 A.2d at 611. The point is that zoning permit applicants are entitled to know: "What facts must I present to gain the Board's approval?" *Stucki v. Plavin*, 291 A.2d 508, 511 (Me. 1972); see also *Wakelin v. Town of Yarmouth*, 523 A.2d 575, 577 (Me. 1987) (landowner must be able to discern what use can be made of the land); *Hardin County v. Jost*, 897 S.W.2d 592, 595 (Ky. Ct. App. 1995) (same).

A detailed examination of the record in the Handy case, the only case for which we have a complete record,[6] indicates that the absence

---

[6] The record in Jolley is incomplete because the parties put aside a discovery dispute to resolve the issue of the proper construction of § 4443(d), and the case never reached the point where the environmental court could issue findings of fact. For example,

of standards seriously prejudiced the applicant in presenting any kind of case to the selectboard. The action on Handy's request for selectboard approval to proceed under the old bylaws began with a public hearing. The notice of the hearing provided no specification of how the selectboard would approach the issue before it, stating only that the board would consider Handy's request for a multi-use facility that included a gas station. At the commencement of the hearing, the selectboard chair announced the issue as whether the proposal "fit into the regulations that were passed by the selectboard on January 21." Because the January 21 amendment prohibited the exact use proposed, this was tantamount to a prehearing announcement that Handy could not prevail. Another selectman stated that precise position, noting that, based on a legal opinion of town counsel, "[t]here is only one choice and that is to deny."

Handy's representative made arguments that the equities,[7] particularly the fact that the gas-station use had been presented prior to the warning of the amendment, warranted the granting of permission to proceed under the old bylaws, but the selectboard denied the request because it would "result in the knowing creation of a non-conforming use, in contravention of both general principles of zoning law and the clear intent of the recent amendments." This was the same position taken by the chair at the beginning of the hearing. Although the selectboard also indicated that it was unpersuaded by Handy's equitable arguments, it never took the position that equitable considerations could ever require it to grant permission to proceed under the old bylaws. Thus, the selectboard never committed itself to be bound by any standards either in the Handy case or any future case.

We recognize that a standard sufficient to save the statute can be general, and can be derived from historical usage, see *Kent v. Dulles,*

unlike in Handy, the record does not contain the minutes of Jolley's selectboard hearing.

[7] There is absolutely no support in the record for the dissent's statement that "Jolley and Handy knew what factors would be relevant to the Town's decision under § 4443(d)." 171 Vt. at 354, 764 A.2d at 1241. Apparently, the dissent is relying on the fact that the selectboard appeared to deal with the arguments of Jolley and Handy, rather than labeling them as irrelevant. In taking this approach, however, the selectboard committed itself to no standards, as it would have had it labeled arguments as relevant or irrelevant. Rather than supporting the dissent's position, the Town's actions are inconsistent with that position. If the issue were to arise again in a case where the applicant had stronger equities, the selectboard would be free to decide that such equities were irrelevant, and the only question would be whether the proposed use was not inconsistent with the policy behind the zoning amendment, even if inconsistent with its letter.

357 U.S. 116, 127-28 (1958), or other parts of the statutory scheme. See *Vincent*, 148 Vt. at 535-36, 536 A.2d at 929; *State v. Chambers*, 144 Vt. 234, 239, 477 A.2d 110, 113 (1984). But, here, the specific statute involved, 24 V.S.A. § 4443, provides absolutely no standard or guidance. To the contrary, on its face, it provides unlimited discretion for a selectboard to grant or deny permission for a zoning applicant to proceed under the unamended ordinance. There is no historical usage. If we look at the zoning statutes overall, we find general and inclusive policy statements that do not help provide limits for administration of § 4443(d). *Id.* § 4302 (purpose and goals of zoning).

The Town suggests, and the dissent agrees, 171 Vt. at 356, 764 A.2d at 1243, that we can find a standard in the Legislature's authorization that towns may "prohibit expansion and undue perpetuation of nonconforming uses." 24 V.S.A. § 4408(b). We agree that nonconforming use policy should be relevant to a selectboard's decision, but its effect in the Handy case was to eliminate the exercise of discretion entirely. If the Legislature believed that avoidance of nonconforming uses should be the controlling policy in all instances, it could have simply made the effective date of any zoning amendment retroactive to the date it was first warned. Perhaps it did not do so because the perpetuation policy is not itself absolute; it prohibits only "undue" perpetuation.

We also recognize that the Legislature intended to give municipalities flexibility in dealing with development proposals at variance with new proposed zoning rules. But a grant of flexibility to the municipality is constitutional only if it is accompanied by some ability of landowners to predict how discretion will be exercised and to develop proposed land uses accordingly. Flexibility cannot be a synonym for ad-hoc decision making that is essentially arbitrary. We cannot ignore that in a small town environment, the people involved, and affected by, the decision-making process have frequently had extensive interaction with each other, and the use of flexibility may reflect that interaction rather than neutral, predictable, and universal administrative standards.

Nor can we resolve the deficiency in the statute by announcing that the selectboard does not have unfettered discretion and creating a "reasonable basis" review standard. 171 Vt. at 357-58, 764 A.2d at 1244. This course of action would offend all three of the reasons why a standardless delegation is unconstitutional. As demonstrated by what transpired in the instant cases, it would most offend the requirement that the landowner be given prior notice of what the rules are, but it would also fail to ensure consistent decision making.

■ Finally, we emphasize two points about the impact of today's decision and its effect on the decisions of the environmental court, particularly in Handy. There is no constitutional impediment to the Legislature requiring special selectboard review of development proposals that are filed after a zoning amendment is warned and are affected by the warned amendment, as long as the review requirement contains appropriate standards to govern the selectboard determination. Such a requirement serves an important public interest: to prevent a change in land use policy from being undermined by last-minute development which is inconsistent with the new policy. As noted below, our vested rights jurisprudence recognizes this policy. Indeed, if the standards urged by the dissent were added to the statute, the constitutional defect would be cured.

The second point is about the effect of this decision. As the environmental court explained, the decision that Handy does not have to go through selectboard review, and our similar ruling for Jolley, does not end the question of which version of the zoning ordinance applies. Our vested rights jurisprudence, first announced in *Smith v. Winhall Planning Commission*, 140 Vt. at 181-82, 436 A.2d at 761-62, normally vests a right in the developer to develop under the zoning ordinance in effect at the time of application. In adopting this minority rule, we explained that it particularly fit a situation "where no amendment is pending at the time of application," *id.* at 182, 436 A.2d at 761, and that under the rule, the zoning proceedings must be "'validly brought and pursued in good faith,'" *id.* at 182, 436 A.2d at 762 (quoting *In re Preseault*, 132 Vt. 471, 474, 321 A.2d 65, 66 (1974)). In fact, jurisdictions keying vested rights to the date of application generally have an exception for cases where a zoning change is pending on that date. 4 E. Ziegler, Rathkopf's The Law of Zoning and Planning § 50.04[1][b], at 50-20 (1999) ("Probably the most significant limitation on the [minority] rule is where a zoning change is pending at the time of an application."). Thus, even though zoning amendments are effective on the date of adoption, or twenty-one days later, 24 V.S.A. § 4404, a developer may not have a vested right in an application filed while a proposed amendment is pending.

Contrary to the argument of the dissent, the "good faith" standard is specific and ascertainable, having been adopted and described in numerous decisions from other states. See, e.g., *Stowe v. Burke*, 122 S.E.2d 374, 379-80 (N.C. 1961); *Penn Township v. Yecko Bros.*, 217 A.2d 171, 173 (Pa. 1966); see generally *City of Jackson v. Lakeland Lounge*, 800 F. Supp. 455, 461-62 (S.D. Miss. 1992) (collecting cases);

G. Hanes & J. Minchew, *On Vested Rights to Land Use and Development*, 46 Wash. & Lee L. Rev. 373, 398-400 (1989). Moreover, it is a rule of law to be applied according to its terms and not a broad grant of discretion to a decision maker to act within wide boundaries or no boundaries at all.

We cannot determine on this record whether Handy's application was validly brought and pursued in good faith. Although the environmental court could make that determination in the first instance, we agree with it that the better procedure is that the zoning board make that determination first with review by the environmental court. We affirm that holding.

Similarly, because of the very limited factual development in the environmental court, we also cannot assess the Jolley application against this standard. We note only that because Jolley's application came later in the process, its burden to show that it did not engage in a race to put in some development proposal before the ordinance became effective is much higher. See *Yecko Bros.*, 217 A.2d at 173 (landowner must show it did not race to get the permit before a change was made in the zoning ordinance).[8]

*The environmental court's November 14, 1997 decision with respect to the Handy applications is affirmed. The environmental court's November 14, 1997 decision with respect to the Jolley applications is vacated. The cases are remanded for further proceedings consistent with this opinion.*

**Johnson, J.**, dissenting. Today, the majority strikes down as unconstitutional a legislative act that significantly affects public interest, even though none of the parties in either of the consolidated appeals has ever challenged the constitutionality of the statute at any point during the proceedings, including here on appeal. Thus, there is no lower court ruling on the constitutional question raised sua sponte by the majority. Nor is there any briefing on the issue. Nor was the Attorney General ever warned of any potential constitutional infirmity to the statute or given an opportunity to respond to any such

---

[8]Presaging our reversal of the environmental court's interpretation of § 4443(d), the parties dispute whether the court's review of a town's decision under the statute is de novo or in the nature of ordinary appellate review. Further, both Jolley and the Town take exception to the environmental court's determination that conditional-use applications must be considered by the zoning board of adjustment before the selectboard's review under § 4443(d). We need not decide these issues because of our conclusion that § 4443(d) is unconstitutional.

perceived infirmity, as required by our rules. V.R.A.P. 44 (party questioning constitutionality of legislative act in proceeding before Supreme Court in which state agency is not party must give immediate notice in writing to Court of existence of constitutional challenge, whereupon, clerk of Court "shall . . . certify such fact to the Attorney . General, who shall be permitted to intervene for argument on the question of constitutionality"); cf. Fed. R. App. P. 44 (same); 28 U.S.C. § 2403 (in federal court proceeding in which constitutionality of federal act or state statute is challenged, court shall certify that fact to Attorney General of United States if federal act is being challenged or to state Attorney General if state statute is being challenged, and shall allow United States or state to intervene with all rights of party).*

Notwithstanding the lack of argument concerning the validity of the statute, the majority strikes down § 4443(d) based on a doctrine that, even the majority concedes, has been applied inconsistently and has been described by the leading legal scholar on administrative law as "'almost a complete failure.'" 171 Vt. at 346 n.5, 764 A.2d at 1236 n.5 (quoting K. Davis, *A New Approach to Delegation,* 36 U. Chi. L. Rev. 713, 713 (1969)). The majority justifies its decision to strike down § 4443(d) by stretching beyond the breaking point the maxim of appellate review that this Court "may affirm a correct judgment even though the grounds stated in support of it are erroneous." *Gochey v. Bombardier, Inc.,* 153 Vt. 607, 613, 572 A.2d 921, 925 (1990).

Yet the majority is not affirming the environmental court's decisions in any sense. The environmental court did not even consider the constitutionality of § 4443(d), let alone strike it down. To the contrary, the court ruled in its two decisions that good-faith applications filed between public notice and a town's adoption of a proposed zoning

---

*The majority cites one case — *Tonya K. v. Board of Educ. of Chicago,* 847 F.2d 1243 (7th Cir. 1988) — for the proposition that Rule 44 "is not jurisdictional so as to prevent the adjudication of a constitutional issue in the absence of official notice." 171 Vt. at 343, 764 A.2d at 1234. In *Tonya K.,* in response to a claim that the district court failed to notify the Illinois Attorney General that the constitutionality of a state statute had been drawn into question, the Seventh Circuit Court of Appeals noted that, although the correct procedure had not been followed, the Attorney General had been notified of the case three months before oral argument. The court stated: "The Executive Branch therefore has *actual notice* of the case and has had time to exercise its right to intervene." *Tonya K.,* 847 F.2d at 1247 (emphasis added). In marked contrast to the majority here, the Seventh Circuit concluded that "belated notice satisfies any requirement" because it provides an opportunity for the Attorney General to makes its views known and to take a direct appeal should a state statute be declared unconstitutional by a lower court. *Id.*

amendment are entitled to review under the old bylaws, but that applications filed between the adoption and effective date of the proposed amendment must be considered under the amended bylaws. Thus, in the Jolley case, as the majority's mandate indicates, the environmental court's decision is reversed. As for the Handy case, the environmental court remanded the matter to the zoning board of adjustment for conditional use or variance approval under the old bylaws, noting that later review might be necessary before the selectboard under § 4443(d) to determine if the applications were made in good faith. Of course, after today's decision, no further review under § 4443(d) is possible.

The majority's efforts to "affirm" the environmental court's decisions, and thereby justify striking down § 4443(d) without the benefit of briefing, only compound its problems. With little discussion and — once again — without the benefit of briefing, the majority impliedly adopts a pending-amendment exception to Vermont's minority vested rights rule, stating that "a developer may not have a vested right in an application filed while a proposed amendment is pending." 171 Vt. at 350, 764 A.2d at 1239 (emphasis added). Ironically, the effect of the majority's holding is that, when permit applications are filed while zoning amendments are pending, municipalities will have the unbridled discretion to deny the applications based solely on the existence of the proposed amendments. Apart from citing out-of-state cases in which the highly variable exception has been applied, *id.*, the majority provides no standards for determining which situations call for rejecting applications filed within the pendency period and grounded on claims of vested rights. This arguably creates the same potential for abuse claimed by the majority with respect to § 4443(d). By striking § 4443(d) and then adopting the pending-amendment exception without establishing any guidelines for its application, the majority does, by judicial opinion, precisely the same thing that it claims the Legislature erred by doing in § 4443(d) — permitting standardless decision making. We have come full circle.

In short, today's decision does not affirm the trial court's judgment, but rather sets forth broad holdings — without the benefit of briefing and based on questionable legal theories — that were not contemplated by the environmental court and that are contrary to the legislative will. Because I concur with the majority's interpretation of the meaning of § 4443(d), I would reverse both of the environmental court's decisions and remand the matter to that court to review the selectboard's § 4443(d) decisions under an abuse of discretion stan-

dard. If forced to confront the constitutional issue, I would invite the Attorney General to respond to our constitutional concerns. For these reasons, I respectfully dissent.

In the majority's view, § 4443(d) unconstitutionally delegates discretionary authority to town selectboards without providing explicit standards upon which to base that discretion. 171 Vt. at 337, 764 A.2d at 1230. The majority further believes that the statute's claimed constitutional infirmity deprived the permit applicants of prior notice as to what criteria were relevant to the Town of Shelburne's decisions whether to allow review of their applications under the old or amended zoning law. *Id.* at 347-48, 764 A.2d at 1237-38. According to the majority, because members of the Shelburne selectboard believed that § 4443(d) compelled them to reject the instant applications, the applicants, particularly Handy, had no real opportunity to make their case as to why the old zoning law should be applied to their permit applications. *Id.*

Apart from the lack of briefing on the constitutionality of § 4443(d), I do not believe that the record supports the majority's view of the facts. Both Jolley and Handy knew what factors would be relevant to the Town's decision under § 4443(d). Further, they both had an opportunity to make the selectboard aware of the relevant equitable considerations, and in fact took advantage of that opportunity by raising those considerations in the hearings before the selectboard. Moreover, the selectboard declined to apply the old zoning law to the Jolley and Handy applications after explicitly addressing the equitable arguments raised by the applicants and acknowledging that § 4443(d) gave the Town the discretion to apply either the old or the amended zoning law.

In the Jolley case, various representatives appeared and testified on behalf of Jolley Associates at the March 11, 1997, hearing before the selectboard. Jolley's attorney specifically reviewed the history of the permit applications from Jolley's perspective. The attorney complained that, at a September 24, 1996, meeting, town officials discussed only the old zoning bylaw with Jolley's representatives, even though the Shelburne Planning Commission had already conducted several work sessions on the new amendment. At the hearing, Jolley also pointed out that it had already expended over $20,000 under the purchase-and-sales agreement it had signed with the owner of the property upon which it hoped to operate its new business. Thus, Jolley was well aware that equitable considerations such as the timing of prior permit applications, the expectations of the parties, and the

expenditures of the applicant in reliance on those expectations were the kind of factors that the selectboard would weigh in deciding which law to apply.

In its decision of March 25, 1997, the selectboard acknowledged the testimony of Jolley's attorney that Jolley had expended $20,000 under its purchase-and-sales contract and that the proposed zoning amendment had not been discussed at a September 1996 meeting between town officials and Jolley's representatives. The selectboard expressly recognized that it "at all times retains discretion to approve an application" under § 4443(d). Nevertheless, the selectboard determined that "the equitable factors in this case do not weigh in favor of granting Jolley's application." The selectboard pointed out that (1) the Town properly warned the planning commission work sessions that were conducted on the proposed amendment before September 1996, but that Jolley did not directly participate in that process; (2) most of the money that Jolley had expended in preparing its application was refundable, putting it in no worse situation than if it had known of the proposed amendment before September 1996; (3) Jolley submitted its application only five days before the effective date of the amendment; and (4) allowing the proposed application would create a use not permitted under the new zoning law, in contravention of the strong presumption in Vermont law against the undue perpetuation of nonconforming uses.

Thus, Jolley had an opportunity to make its case. It was obvious to all concerned that equitable considerations, along with the nature of the proposed use and its status under the new zoning law, were the relevant factors that the selectboard would consider in determining whether to grant the application.

The same is true in the Handy case. The minutes of the February 10, 1997, hearing reveal that both Paul Handy and his representative reviewed the history of their application for the proposed project. They pointed out that the application was first submitted in June 1996, and that it was denied in August 1996 for reasons unrelated to the gas station that was proposed. These facts were undisputed and have not been challenged by the Town. Handy's representative conceded that his application did not comply with the new zoning law, but complained that he had been unaware of the changes that were proposed under the new amendment. In its decision of June 3, 1997, the selectboard noted that Handy's representative had reviewed the history of the original application and indicated that Handy had been unaware of the proposed amendment to eliminate gas station use in

the residential-commercial district. The selectboard also recognized that it "at all times retains discretion to approve an application" under § 4443(d), but concluded that Handy's application should be reviewed under the new zoning law because of the strong presumption in Vermont law against perpetuating nonconforming uses. Thus, notwithstanding the majority's statements to the contrary, 171 Vt. at 347-48, 764 A.2d at 1237-38, Handy also had an opportunity to present his case before the selectboard.

Nevertheless, absent any constitutional challenge from either Handy or Jolley, the majority declares § 4443(d) unconstitutional because it does not expressly set forth the specific factors to be considered by a selectboard in deciding whether applications filed during the moratorium period will be reviewed under the old or amended zoning law. The relevant factors are obvious in the context of this discrete, narrow statute. As the majority acknowledges, 171 Vt. at 342, 764 A.2d at 1233, § 4443(d) is aimed at creating a moratorium period with respect to the issuance of permits for proposed projects whose status will be affected by pending zoning amendments. In part, the goal of the statute is to assure that applicants do not take advantage of a proposed change in the zoning laws by filing an application, during the period between the notice and the effective date of the proposed amendment, that is inconsistent with the new laws. In doing so, the statute furthers this state's policy of eliminating nonconforming uses. 24 V.S.A. § 4408(b) (to achieve purposes of zoning and protect public interest, municipalities "may regulate and prohibit expansion and undue perpetration of nonconforming uses"); *Hinsdale v. Village of Essex Junction*, 153 Vt. 618, 626, 572 A.2d 925, 930 (1990) ("Nonconforming uses are inconsistent with the purpose of zoning and are tolerated only because they are antecedent to the applicable zoning provisions. A goal of zoning must be to phase out such uses.").

On the other hand, because there may be situations in which it would be unfair to require an applicant to proceed under the proposed zoning law, § 4443(d) grants town selectboards some flexibility to allow applications to be reviewed under the old law during the moratorium period. Obviously, equitable considerations such as the history of the application, including the extent to which the applicant incurred expenses in reasonably relying on having the application considered under the old law, are relevant to a selectboard's § 4443(d) decision. Another obvious consideration is the status of the proposed use under the old and new laws — for example, whether the proposed

use is going from a permitted use to a conditional use or to a use that is being eliminated altogether, in which case the public policy in favor of eliminating nonconforming uses would become a major consideration. Not surprisingly, these are precisely the issues raised by Jolley and Handy and considered by the selectboard.

The law that the majority cites in support of its contention that § 4443(d) is unconstitutional deals with the duty of towns to set forth within their zoning laws reasonably specific standards that will control the discretion of administrative boards in granting or disallowing special exceptions to permitted uses. See generally 3 K. Young, Anderson's American Law of Zoning § 21.09 (4th ed. 1996). By requiring standards, courts seek to assure that property owners are put on notice as to permitted uses, and that discretion as to whether to allow proposed uses is not exercised in an arbitrary or discriminatory fashion. *In re Miserocchi*, 170 Vt. 320, 325, 749 A.2d 607, 611 (2000); *Town of Westford v. Kilburn*, 131 Vt. 120, 124, 300 A.2d 523, 526 (1973); Young, *supra*, § 21.10, at 723-24 (even under most flexible standard, power of municipal legislative body to grant or withhold special permits must be exercised reasonably, and not "for reasons unrelated to the public health, safety, or welfare").

Under this reasoning, "[s]tandards of the most general character have been held sufficient to guide the boards and provide understandable criteria for judicial review." Young, *supra*, § 21.09, at 713. Indeed, "[t]here may be a trend toward more liberal construction of standards." *Id.* at 716 ("Some courts have been sufficiently impressed with the need for broad delegation of permit-issuing authority to reach out and discover standards where arguably there were none."); see *Department of Transp. v. Armacost*, 532 A.2d 1056, 1064 (Md. 1987) (reviewing United States Supreme Court case law on delegation doctrine and noting that doctrine has returned to dormant state).

I agree with Jolley, and the majority, that town selectboards do not have unfettered discretion under § 4443(d) to withhold consent for issuance of permits under zoning laws that are the subject of pending amendments. While municipal authorities have broad latitude in exercising discretionary powers granted to them, "the general rule is uniformly applied that powers granted in comprehensive terms must be reasonably exercised. It is the province of the court to protect the individual from unreasonable, oppressive, or arbitrary exercise of power within the limits of our constitutional and legal system." 5 E. McQuillin, The Law of Municipal Corporations § 18.04, at 465 (3d ed. 1996).

Thus, there must be a reasonable basis for § 4443(d) decisions in light of the legislative policy behind the statute; decisions that are arbitrary, discriminatory, or based on favoritism cannot stand. Young, *supra*, § 21.10, at 720 (legislative body acting in administrative capacity "must follow the zoning regulations, and its actions are reviewable, and subject to judicial reversal if they are without support in the record or are otherwise arbitrary or unreasonable"). Regardless of whether there are written guidelines or criteria governing permit applications made within the § 4443(d) pendency period, a town's decision not to consent to issuance of a permit under the old zoning laws must at minimum have some reasonable basis for the reviewing court to evaluate so as to eliminate decisions based on favoritism, discrimination, or uncontrolled discretion.

Because of its erroneous construction of § 4443(d), the environmental court did not consider the merits of the selectboard's decisions. Consequently, for the most part, the parties do not address the question of whether the selectboard acted within its discretion in refusing to allow consideration of the applications under the old zoning law. Jolley, however, takes exception to the selectboard's statement that the inconsistency of the instant applications with the amended bylaws, in and of itself, was sufficient under the facts of each of the cases to deny consent for issuance of permits under the old bylaws.

Without addressing the ultimate question of whether the selectboard acted within its discretion in requiring that the applications be considered under the amended bylaws, I see nothing inappropriate in the selectboard's statement. As noted, the selectboard explicitly recognized that it had the discretion to examine the equities of a particular case and grant its consent under § 4443(d), notwithstanding any inconsistency between the application and the amended bylaws. The selectboard merely concluded that the equities and circumstances of the Jolley and Handy cases did not warrant exercising its discretion to consent to the permits under the old bylaws. In making this determination, the selectboard considered that the applications sought approval for uses that were prohibited, even conditionally, under the new bylaws. In the selectboard's view, the strong presumption against allowing nonconforming uses was determinative as to what law should be applied to the applications.

This Court has stressed that the Legislature's delegation of power to an administrative agency may not be unrestrained or arbitrary, but rather must "provide a sufficient standard *or policy* to guide the

Agency's actions." *Rogers v. Watson*, 156 Vt. 483, 493, 594 A.2d 409, 415 (1991) (emphasis added); accord *In re Vermont Power Exch.*, 159 Vt. 168, 177, 617 A.2d 418, 423 (1992); *Vincent v. Vermont State Retirement Bd.*, 148 Vt. 531, 535, 536 A.2d 925, 928 (1987); *State v. Auclair*, 110 Vt. 147, 163, 4 A.2d 107, 114 (1939). Here, the policy behind § 4443(d), a discrete and narrow statute aimed at limiting consideration of permit applications during the pendency of proposed zoning laws, guides the discretion of selectboards in applying the statute. Cf. *Vermont Power Exch.*, 159 Vt. at 177-78, 617 A.2d at 423 (no unlawful delegation of discretion to Public Service Board, where standards required purchase rates to be favorable to public interest, just and reasonable to consumers, and nondiscriminatory toward small power producers). In light of § 4443(d)'s clear policy of creating a moratorium period to prevent applicants from forcing towns to consider proposals before relevant, pending zoning amendments are finalized, there is little doubt as to what criteria are relevant in determining whether the proposals should be considered under the old or amended zoning laws. My review of the record leads me to believe that the legislative policy underlying § 4443(d) has been fulfilled without violating the rights of the applicants.

It is well settled that, absent exceptional circumstances, this Court will not consider constitutional arguments inadequately briefed or not previously raised. *SBC Enterprises, Inc. v. City of South Burlington*, 166 Vt. 79, 83 n.\*, 689 A.2d 427, 429 n.\* (1996) (declining to consider argument, raised for first time on appeal, that city ordinance was unconstitutional bill of attainder); *Quesnel v. Quesnel*, 150 Vt. 149, 150-51, 549 A.2d 644, 646 (1988) (refusing to address challenge to constitutionality of statute where argument was raised for first time on appeal and there was no showing of extraordinary circumstances suggesting that issue needed to be addressed), *overruled on other grounds by Theise v. Theise*, 164 Vt. 577, 674 A.2d 789 (1996). This rule applies with particular force here, where (1) no constitutional challenge was made either before the environmental court or this Court; (2) the majority's sua sponte invalidation of § 4443(d) is based on a controversial application of the delegation doctrine; and (3) there is not the slightest indication that the selectboard's decisions thwarted the policy underlying § 4443(d) or were grounded on favoritism or discriminatory animus.

The effect of today's holding with respect to the instant cases will be to allow uses in the Town of Shelburne that are not permitted under the Town's zoning laws. Moreover, the holding will prevent

towns across the state from denying zoning permit applications filed by those seeking to avoid consideration under proposed amended zoning laws that would restrict or prohibit uses requested in the applications. Such disruption is unwarranted absent any challenge to § 4443(d). I would not strike the statute sua sponte. Rather, I would encourage towns to develop explicit standards within their zoning ordinances for applying § 4443(d), Young, *supra*, § 21.11, at 727 ("The selection of standards, within the limits of the requirement that such standards be adequate, is a function of the local legislative authority."), and would address the constitutional issue in a later case, when it was properly raised and argued.

I am authorized to say that the Chief Justice joins in my dissent.