STATE OF VERMONT

Docket No. 18-2-16 Vtec

| | |
|---|---|
| 29 Pleasant St. Design Plan Approval[1] | DECISION ON THE MERITS |

Pending before the Court is William J. and Marsha K. Bawden's design review application to remove the shutters from their house at 29 Pleasant Street in Woodstock, Vermont. Applicants removed their shutters when they replaced windows and re-painted their house in 2009, but did not file an application to remove their shutters until December 2015. On January 18, 2016, the Village of Woodstock Development Review Board ("DRB" or "VDRB") denied the Bawdens' request to remove shutters from the primary building on their property.[2] The Bawdens' appealed that decision to this Court.

The Court conducted a site visit on August 25, 2016, followed by a one-day merits hearing in the Windsor County Courthouse in Woodstock, Vermont. The Bawdens and the Village of Woodstock participated in the site visit and hearing. The Bawdens are self-represented. The Village is represented by Attorney Todd Steadman.

Based on the evidence admitted at trial, which was put into context by the site visit, the Court renders the following findings of fact and conclusions of law:

**Findings of Fact**

1.      William J. and Marsha K. Bawden own a parcel of land at 29 Pleasant Street in Woodstock, Vermont.

2.      The Bawdens' property lies at the southeast corner of Pleasant Street and Ford Street.

3.      The Bawdens' property is in a "Residential High Density" zoning district. It also lies in the "Design Review" overlay district.

---

[1] This matter was originally captioned "29 Pleasant St. Variance." This is in fact an appeal of a denial of Design Plan Approval, not a variance. The caption has been updated accordingly.

[2] The DRB granted the Bawdens' request to remove shutters from an accessory building in the rear of the property. That part of the DRB decision is not contested and is not under review in this Court.

4.      The Design Review District has two sections; Village and East End.  The Bawdens' property is located in the Village section of the Design Review District.

5.      The neighborhood is a mixed-use area with commercial, service, and residential uses.

6.      The Village's "Light Commercial" zoning district begins one parcel to the east of the Bawdens' property.  The Light Commercial district contains a small grocery store ("Mac's Woodstock Market"), the Village Inn of Woodstock, The Shire (another inn), a bed and breakfast, a book store, and a barber shop.

7.      This Light Commercial district is also in the design review overlay district.

8.      The Village's "Commercial/Light Industrial" district begins east of the Light Commercial district.  It includes a gas station and auto repair shop.

9.      The Commercial/Light Industrial district is also in the design review overlay district.

10.     Across the street and slightly to the west of the Bawdens' property is a Commercial District.

11.     29 Pleasant Street lies to the east of the "Y" where Center Street (Route 4 West) branches off of Pleasant Street and runs through the central village of Woodstock.

12.     The Village's Central Commercial district begins just west of this Y intersection.

13.     The Bawdens' property has two structures on it: a primary dwelling in the front (i.e., roadside) of their property, and an accessory building in the rear of their property.

14.     The Bawdens' primary structure was built sometime around 1835.  It is a federal style building.

15.     The structure likely did not have shutters on it when it was originally built, both because shutters are not traditionally part of the federal style, and because the windows are too close together to easily allow for shutters.  When shutters were on the building, they had to overlap.

16.     By the 1880's, owners of the structure had added shutters to the building.

17.     The two properties adjacent to the east and west of the Bawdens property have shutters. These two properties are similar situation with respect to their visibility.

18.     The Bawdens removed their shutters in 2009 as part of renovations to replace the window sashes on their house (for which they had the necessary design plan approval).

19.     The Bawdens preferred the appearance of their house without shutters, so they kept the shutters off of the house.

20.     The Village notified the Bawdens that they needed to either replace the shutters or seek approval to keep the shutters off the house.

21.     The Bawdens filed an application for approval to keep the shutters off, and the Village denied the application.

22.     The Bawdens timely filed this appeal.

### Conclusions of Law

**I.      Questions Beyond the Scope of This Appeal**

The Bawdens filed an eleven-question Statement of Questions. Their Statement of Questions raises some issues that are beyond the scope of this appeal and some that are irrelevant.

First, they raise certain questions regarding enforcement, asking "what are Woodstock Village requirements for notifying a property owner of non compliance with zoning violations?" (Question 1); "Is there a statute of limitations following removal of shutters when the owner must be notified and reminded of a possible zoning non compliance?" (Question 2); "Which… properties" that once had shutters "received notification of a possible zoning regulation violation and what is the basis for not having shutters?" (Question 3); and "What basis is there for applying regulations differently on the north side of the street and the south side of the street" (Question 6).

The Environmental Division is a Court of limited appellate jurisdiction.  We can only review those issues the municipal panel below had the authority to address when considering the original application.  See In re Transtar, LLC, No. 46-3-11 Vtec, slip op. at 4 (Vt. Super. Ct. Envtl. Div. May 24, 2012) (Durkin, J.).  Here, we are reviewing the Bawdens' application for design plan approval.  Therefore, we can only address whether the Bawdens should receive design plan approval to remove their shutters.  We cannot give the Bawdens advisory opinions on whether they would be subject to an enforcement action if they do not receive approval, how an enforcement action would work, or whether they are protected by the statute of limitations.

Questions 1, 2, 3, and 6, which ask about the procedures for bringing an enforcement action, the statute of limitations for an enforcement action, and whether similarly situation properties have received enforcement notices, are therefore outside the scope of this appeal. As such, we **DISMISS** Questions 1, 2, 3 and 6.

### II. Questions This Court Will Address

As argued by the parties during trial and within post-trial briefs, the remaining questions get to the heart of this case: whether the Village's zoning regulations "specify sufficient conditions and safeguards" to guide applicants and decisionmakers. Town of Westford v. Kilburn, 131 Vt. 120, 122 (1973). While regulations should allow some breathing room for decisionmakers to avoid inflexible and unworkable permit conditions, "they should not leave the door open to unbridled discrimination." Id. at 124–25.

We first determine whether the appellants' Statement of Questions properly raises the issue of standardless regulation. In addition to being a court of limited appellate jurisdiction, this Court's scope of review is determined by the Questions. See V.R.E.C.P. 5(f); In re Garen, 174 Vt. 151, 156 (2002). That is, the Statement of Questions restricts the issues this Court will consider. The Court's jurisdiction includes issues raised both explicitly in each Question, as well as issues intrinsic to those Questions. See In re Jolley Assocs., 2006 VT 132, ¶ 9, 181 Vt. 190.

The remaining Questions raise the intrinsic issue of whether the Village's zoning regulations are sufficiently clear and specific enough to 1) guard against standardless, arbitrary discretion by decisionmakers and 2) give landowners notice of what they can and cannot do to their property. See In re Pierce Subdivision Application, 2008 VT 100, ¶ 19, 184 Vt. 365; In re Handy, 171 Vt. 336, 349 (2000). In a nutshell, the Questions ask whether the zoning regulation regarding shutters are standardless and invite discriminatory application.

Specifically, the Questions raise concerns about past practices of the DRB (Questions 9, and 10); how the DRB defines "residential character" and "neighborhood" in light of surrounding uses (Questions 4 and 5); and whether the Village has applied the zoning regulation based on arbitrary and ill-defined criteria (Questions 7, 8, and 11). The Bawdens argue that they should be allowed to remove their shutters because of the enhanced street appeal of the property; the home's fenestration, which does not easily accommodate shutters; the enhanced historical

4

accuracy in removing the shutters from the home; and the fact that other homes in the area have been allowed to remove their shutters. We first consider whether the Village's zoning regulations " 'specify sufficient conditions and safeguards' to guide applicants and decisionmakers." In re Appeal of JAM Golf, LLC, 2008 VT 110, ¶ 13, 185 Vt. 201 (quoting Kilburn, 131 Vt. at 122.)

**a. The Village's zoning regulations specify sufficient conditions and safeguards.**

Woodstock prides itself on its international reputation as a traditional New England town. See Village Zoning Regulations § 405(A) and TOWN & VILLAGE OF WOODSTOCK, VERMONT COMPREHENSIVE PLAN 2014, 49. According to the Village Comprehensive Plan, green shutters on white-painted homes became standard in the 19th and 20th centuries. Id., 50. Prior to 2015, the Village's Zoning Regulations addressed shutters as follows:

> Before granting Design Plan Approval, the VDRB [Village Development Review Board] shall find that the proposal conforms substantially to the following design criteria:
>
> . . .
>
> Architectural features, including but not limited to: cornices, windows, shutters, fanlights, and entablature, prevailing in the immediate area, shall be considered in the construction or alteration of a building. It is not intended that the details of old buildings be duplicated precisely, but they should be regarded as suggestive of the extent, nature and scale of details that would be appropriate on new buildings or alterations.

Village Zoning Regulations § 405(G)(6) (2012). In 2014, we read this section of the regulations to require <u>consideration</u> of certain architectural features, including shutters, without making the inclusion of such features mandatory. Sligar & Sattelberger Permit Amendment, No. 152-11-13 Vtec, slip op. at 3 (Vt. Super. Ct. Envtl. Div. Oct. 20, 2014) (Durkin, J.). Pursuant to that reading, we granted an applicants' permit amendment to exclude shutters from their home. Id. at 4.

Following this Court's decision in Sligar & Sattelberger, the Village amended its zoning regulations. Village Zoning Regulations Design Review Amendments (May 12, 2015). In amending the regulations, the Village's apparent intent was to empower the DRB and other decisionmaking bodies to require that landowners in the Design Review District retain shutters on their buildings. The amended regulations remove § 405(G)(6) of the 2012 regulations, quoted above, and address shutters as follows:

Before granting Design Plan Approval, the VDRB shall find that the proposal conforms to the following design criteria. New construction shall consider these items as design guidelines. For additions and alterations, these design items shall be retained where appropriate. Although all the criteria are important, those items which are easily visible in the context of streetscape are particularly sensitive.

. . .

Existing architectural features, including but not limited to: shutters, cornices, windows, fanlights, and entablature, shall be retained where appropriate. New details shall consider those prevailing in the immediate area.

Village Zoning Regulations § 405(G)(7) (2015).

The Bawdens argue that the new language "where appropriate" is subjective without further guidance in the bylaws. The Bawdens offer that what is "appropriate" to one member of the DRB may not be "appropriate" to another, and the regulations therefore fail to give notice to the untrained landowner regarding when it is "appropriate" to retain, or remove, shutters. This argument aligns with the principle that while some flexibility in municipal zoning regulations is beneficial, "[f]lexibility cannot be a synonym for ad-hoc decision making that is essentially arbitrary." Handy, 171 Vt. at 349. The danger is particularly pronounced in small towns, where decision-makers and affected persons frequently interact. Id. "[H]ow that flexibility is used may reflect that interaction rather than neutral, predictable, and universal administrative standards." Id.

The law provides a strong counterpoint, however. Although we must invalidate ordinances that "fail to provide adequate guidance" and thus lead to "unbridled discrimination," we will uphold even general standards if the entire ordinance provides sufficient guidance. Pierce Subdivision Application, 2008 VT 100, ¶¶ 20, 24 (quoting Kilburn, 131 Vt. at 124). In our review, we look to the plain language of zoning regulations, following general principles of statutory construction, and with the purpose of giving effect to legislative intent. See In re Weeks, 167 Vt. 551, 554 (1998). Words in zoning ordinances are interpreted in a manner that gives "effect to the whole and every part of the ordinance." In re Trahan, 2008 VT 90, ¶ 20, 184 Vt. 262 (citing In re Stowe Club Highlands, 164 Vt. 272, 279 (1995)). Where zoning regulations are ambiguous we interpret them in favor of the landowner. Weeks, 167 Vt. at 555 (citations omitted).

This case presents a close call. Looking first to the specific regulation[3] that addresses shutter alterations, § 405(G) states that "design items" [including shutters, § 405(G)(7)], "shall be retained where appropriate," and that design items that are "easily visible . . . are particularly sensitive." If the detail is sensitive, the reasonable inference is that the DRB is more likely to determine it is appropriate to retain that detail. Shutters framing the front and side windows of homes are more visible than shutters on the back of the house, or on accessory buildings not easily visible from the street. Section 405(G)(7) states that "[e]xisting . . . shutters . . . shall be retained where appropriate," and that "[n]ew details shall consider those prevailing in the immediate area." The absence of shutters on a home after more than 100 years spent framing its windows qualifies as a "new detail." The removal of the shutters is therefore appropriate if similarly situated buildings in the immediate area have no shutters.

Section 405(G) lists seven categories of design criteria under the general heading of "buildings." Six of the seven criteria instruct DRB to consider similar features in neighboring buildings, or in the immediate area, before approving a proposal. § 405(G)(1)–(6). The seventh, which addresses shutters, is the only category suggesting that existing appearances should be retained; only after this does it call for considering the immediate area. § 405(G)(7) ("[e]xisting . . . shutters . . . shall be retained where appropriate," and "[n]ew details shall consider those prevailing in the immediate area"). This indicates that subsection (7) weighs in favor of retaining existing appearances, at least more than the other six subsections do, and that if changes are made, they should conform with the appearance of the immediate area.

While § 405(G)(7) is specific to shutters, the Statement of Character describing the aspirational goals for the design of the Village, where the Bawdens' home is located, contains more general guidance:

> The Village of Woodstock has an international reputation as one of the finest examples of a traditional New England village whose visual character has evolved over time. This character is presented, not by single buildings or site features, but by the collective view which defines the streetscape of the Village. *Incremental change to specific features, such as shutters*, porches, picket fences and plantings, can significantly alter the continuity of this character. New construction, additions

---

[3] The Bawdens first removed their shutters in 2009, before the May 12, 2015 amendments to the design review provisions of the Regulations were enacted. They did not file their formal application to remove the shutters until December 2015, however. The May 12, 2015 amendments therefore apply to their application.

7

and alterations shall be complementary to the configuration of existing buildings and streetscape, which reflects the traditional scale, proportions, shapes and rhythms of the surrounding neighborhood.

Regulations § 405(A) (2015) (emphasis added). This Statement signals that changes to the existing appearance of the Village—including changes to shutters—must be carefully considered in the context of the "existing buildings and streetscape" and "traditional scale, proportions, shapes and rhythms of the surrounding neighborhood." The Statement takes a cautious approach to any change, favoring the traditional instead. While general in tone, the Statement also specifically mentions shutters. As in § 405(G)(7), this subsection seems to weigh in favor of retaining "specific features," such as shutters. Again, where changes are made, they should conform with the surrounding area.

"Appropriate" is not defined in the regulations, but the word is sprinkled throughout the document, providing more context for our understanding. For example, the DRB will determine the "appropriate" number of homes to build in a planned development by considering the site conditions. Id. § 312(A)(3). In planned developments the DRB will also determine the "appropriate" size and type of trees, ground cover and other vegetation based on what is required to buffer developments from natural features, to provide privacy, to preserve existing features, and establish barriers. Id. § 312(B)(4). "Appropriate native vegetation" is encouraged to stabilize stream banks and serve as a riparian buffer. Id. § 403(A)(1)(c)(iii). By choosing the word "appropriate," the Village has given the DRB some leeway to determine its look and feel. But that leeway is bounded by some rationale that may be gleaned by the context in which the word "appropriate" appears: the number of homes on a lot should be limited by buildable site conditions, for instance. And the type of vegetation required will serve a functional and aesthetic purpose. "Appropriate" in the context of shutters on 29 Pleasant Street depends on visibility and the style prevailing in the immediate area.

We next look to the zoning regulations' enabling statute, the Vermont Planning and Development Act. 24 V.S.A. Chapt. 117. Among the general purposes of the Act are to "encourage the *appropriate* development of all lands in this State by the action of its constituent municipalities . . . to encourage *appropriate* architectural design . . ." 24 V.S.A. § 4302(a) (emphasis added). The Act does not define "appropriate." The State Legislature, like the Village,

gives power to the municipal bodies to shape their community.  The bounds can be gleaned from other parts of the Act. Section 4302(d) requires regulations to be based on present conditions and future trends and growth, and with "reasonable consideration . . . for the landowner, . . . to needs and trends of the municipality, . . . to the character of each area and to its peculiar suitability for particular uses in relationship to surrounding areas, and with a view to conserving the value of buildings." This comports with §§ 405(G)(7) and 405(A): changes to the appearance of buildings are permissible, but any decision whether to do so should take into account the character of the surrounding area and perhaps lean in favor of maintaining existing appearances.

Finally, we look to the common dictionary definition of "appropriate." Franks v. Town of Essex, 2013 VT 84, ¶ 8, 194 Vt. 595 ("Words that are not defined within a statute are given their plain and ordinary meaning, which may be obtained by resorting to dictionary definitions.").  The American Heritage Dictionary defines "appropriate" as "suitable for a particular person, condition, occasion, or place; fitting." American Heritage Dictionary of the English Language, (5th. ed. 2016); see also Webster's II New College Dictionary 56 (2nd ed. 2005) (defining "appropriate" as "suitable : fitting").  In the context of zoning regulations, "appropriate" is what is suitable or fitting within the community's standards, or what belongs in the community.

"Appropriate" is not a word easily reduced to specific standards. It's more suited to ensure consistency in design, with some flexibility to avoid inflexible and unworkable zoning conditions. In this case, the State and the Village have intended to give the DRB some room to interpret what is appropriate, within the bounds of what is suitable, what the prevailing conditions are in the immediate area, and with special attention given to structures in easily visible areas.  Given these parameters, the Village's zoning regulations are not standardless. They specify sufficient conditions and safeguards to regulate the use of shutters in the Design Review District.

**b.  The Bawdens' application to remove their shutters is DENIED.**

Based on the visibility of the Bawdens' home and the number of homes with shutters in the immediate area, it is appropriate for the Bawdens' home to retain the shutters it has borne for more than a century. Therefore, the shutters "shall be retained." Regulations § 405(G)(7). The Bawdens' application to remove the shutters is DENIED, for the following reasons.

9

First, the Bawdens' home, and its shutters (or lack thereof), is not only easily visible; the home is highly visible, as it is situated on a corner lot of the main thoroughfare leading into and out of Woodstock, just a few blocks from the downtown center and the town green. Second, the home at 29 Pleasant Street is in a mixed use area with a grocery store, motel, antique dealer, insurance agency and a Masonic Temple, establishments where missing shutters do not stand out. The majority of residential structures in the area, however, do have shutters. While shutters are not appropriate for Mac's Market, there is no question they are appropriate on a home on a corner lot which had shutters for more than one hundred years.

### III.     Answering the Bawdens' Explicit Questions

Having resolved the underlying issue presented in the Statement of Questions (i.e., the Village's zoning regulations as they pertain to shutters in the Design Review District are not standardless), we now turn to answering the Bawdens' explicit questions.

Question 4 asks whether the commercial aspect of the neighborhood around 29 Pleasant Street negates the residential neighborhood aspect. We conclude that it does not. The Village's zoning regulations contemplate different uses in close proximity. 29 Pleasant Street is zoned for "Residential High Density," with smaller lot sizes than other residential areas. Just one parcel to the east is an area zoned "Light Commercial," which allows bed and breakfast establishments, offices, retail stores, and other commercial uses with a conditional use permit. Presumably, the question implies that shutters are more appropriate in a purely residential area. We disagree.

Question 5 asks what constitutes residential character and a neighborhood. The Village's zoning regulations establish zoning districts throughout the Village, including the areas zoned for residential use. The regulations provide for minimum lot size and road frontage, and list permitted and conditional uses allowed within the districts. These aspects provide the skeleton of the residential character of each district. The term neighborhood has been considered by this Court when reviewing standing as an interested person pursuant to 24 V.S.A. § 4465(b)(3). To have standing, a person must, among other things, own or occupy property "in the immediate neighborhood" of the proposed project site. See 24 V.S.A. § 4464(b)(3).

"To interpret 'immediate neighborhood,' this Court has examined not only the proximity to the project on appeal, but also whether properties potentially could be affected by any aspects of the project which have been preserved for review on appeal." In re A. Johnson Conditional Use Permit, No. 130-7-05 Vtec, slip op. at 3 (Vt. Envtl. Ct. Mar. 28, 2006) (Durkin, J.), aff'd No. 2007-113 (Vt. 2007) (mem.) (internal citations omitted). The determination of neighborhood is made on a case-by-case basis by examining the physical environment surrounding the project property and its nexus to other properties. Id. (citing In re Bostwick Road Two-Lot Subdivision, No. 211-10-15 Vtec, slip op. at 2–4 (Vt. Envtl. Ct. Feb. 24, 2006) (Durkin, J.), aff'd No. 2006-128 (Vt. 2007) (mem.)). Thus, "neighborhood" is closely related to the physical or environmental impacts to property alleged to occur if the project is permitted. See In re UVM Certificate of Appropriateness, No. 90-7-12 Vtec, slip op. at 10 (Vt. Super. Ct. Envtl. Div. Feb 26, 2013) (Walsh, J.) aff'd no. 13-301 (Jan. 23, 2014) (unpub. mem.).

Question 7 asks why 29 Pleasant Street is considered part of the Village rather than the East End for purposes of the zoning regulations. Exhibit F and the testimony provided at trial established 29 Pleasant Street as part of the Village section of the Design Review District.

Question 8 asks where shutters are defined in the zoning regulations, and where it says shutters must be replaced with shutters of similar characteristics, size and configuration regardless of fenestration and street appeal. Shutters are not defined in the regulations. Neither is roof or awning. These are architectural features that are commonly known and do not require a definition. The regulations also do not specifically require shutters of similar characteristics, size and configuration as replacements, however, we conclude that the word "retained" implies the feature would be retained as they were prior to the alteration.[4]

Question 9 asks what the Village's regulations are for requiring shutters on both front and side windows. Because shutters are required to be retained where appropriate, and

---

[4] We do not read Question 8 to raise the question of whether removing shutters triggers design review. Even if that question were posed, the answer would be yes. Section 405(B)(1) lists a variety of activities that trigger design plan review. Subsection (f) requires design plan approval for "[a]ddition or removal of materials to or from the exterior of a building" and subsection (g) requires design plan approval for the "removal of exterior site features such as permanent fences, stone walls, awnings, arbors, canopies, gazebos, garden sheds, mechanical equipment and lighting." The list in § 405(B)(1)(g) is not exhaustive, as signaled by the phrase "such as," and shutters are an exterior feature similar to awnings and lighting. Therefore, § 405(B)(1)(f) and (g)apply to shutters.

appropriateness depends in part on visibility, it follows that even if shutters are required on the front and side windows of a home, they may not be required on the back of a home because they would not be visible to passersby.

Questions 10 and 11 ask to what degree recent shutter-related actions impact the DRB's deliberations, and to what degree the DRB considers the historical significance of homes like 29 Pleasant Street that are on the National Historical Register. Because this Court review is de novo, meaning fresh and new without having to consider the DRB's decision below, we do not consider the DRB's deliberations. Additionally, the zoning regulations do not speak to homes on the National Historical Register and therefore, that aspect is not controlling.

### Conclusion

For the above reasons, we DENY the Bawdens' request to remove the shutters from the primary building at 29 Pleasant Street. In so concluding we AFFIRM the DRB's decision. As allowed by the DRB, shutters are not required on the upper dormer windows on the east and west sides of the primary building.

This concludes the matter before the court. A judgment order accompanies this decision.

Electronically signed on September 23, 2016 at 10:46 AM pursuant to V.R.E.F. 7(d).

_____
Thomas G. Walsh, Judge
Superior Court, Environmental Division